IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HILCO DILIGENCE SERVICES, LLC<br><br>and<br><br>HILCO VALUATION SERVICES, LLC,<br><br>Plaintiffs,<br>v.<br><br>SIKICH, LLC,<br><br>Defendant. | Case No. __________ |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs, Hilco Diligence Services, LLC ("HDS") and Hilco Valuation Services, LLC ("HVS") (collectively, "Hilco" or "Plaintiffs"), for its Complaint against Sikich, LLC ("Sikich" or "Defendant"), states as follows:

**INTRODUCTION**

1. This is an action filed by Hilco against Sikich for violations of the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq.*, ("DTSA") and the Illinois Trade Secrets Act, 765 ILCS 1065/1, *et seq.* ("ITSA"), and tortious interference with Hilco's contractual relationships with its former employees, Mark Stevens ("Stevens") and Michael Baiocchi ("Baiocchi").

2. HDS and Sikich are direct competitors, each providing deal-specific financial and accounting diligence services for commercial lenders (e.g., financial institutions and banks). In 2023, Sikich hired Stevens, Hilco's former Executive Director, into a Director role with Sikich. Sikich hired Stevens despite its knowledge that he was party to an employment agreement containing a non-competition restriction, and that the proposed employment with Sikich would be

in violation of the non-competition restriction, which Stevens breached in accepting the employment position with Sikich. At the time of his hire, Sikich did not have a prominent or well-known business line for asset-based lending ("ABL") diligence—and hired Stevens based on the knowledge and skill he developed in this field, at least in part, while working for HDS.

3. Not content to poach just one of HDS's employees in ABL diligence, in 2024, Sikich recruited and hired another Hilco employee, Baiocchi, to join Stevens' team at Sikich. As with Stevens, Sikich was aware that Baiocchi was also party to an employment agreement with Hilco containing the identical non-competition restriction, and that the proposed employment with Sikich would be in violation of the non-competition restriction, which again Baiocchi, in fact, breached in accepting the employment position with Sikich.

4. In the weeks leading up to Baiocchi's acceptance of employment with Sikich and his resignation from employment with Hilco on October 4, 2024[1], Baiocchi transferred myriad files from Hilco's systems and equipment to his personal devices and/or accounts. In fact, subsequent to Baiocchi's acceptance of and in preparation for, his employment with Sikich, Baiocchi continued to transfer files from Hilco's systems and equipment to his personal devices and/or accounts. Those files included some of Hilco's most confidential, competitively valuable, trade secret information. Later, Baiocchi forwarded these files to Stevens and another Sikich employee, Field Exam Manager Addie Livingston ("Livingston"), who was also a former Hilco employee.

5. When Hilco learned of Baiocchi's egregious misconduct, it took prompt action to investigate and recover its stolen trade secrets, including contacting Sikich directly to address this misconduct. Although Sikich initially indicated it would cooperate with Hilco, Sikich has

[1] Unless otherwise indicated, all dates hereinafter refer to calendar year 2024.

stonewalled Hilco over the past two months, refusing to provide information that would permit Hilco to ascertain the scope of Sikich's use and disclosure of, and the current location(s) of, Hilco's confidential and trade secret information. Hilco seeks permanent injunctive relief to mitigate (to the extent possible) the irreparable harm to Hilco caused by this ongoing gross misconduct, as well as monetary damages.

## PARTIES

6. HDS is, and all times material hereto was, a Delaware limited liability company with its principal place of business in Northbrook, Illinois.

7. HVS is, and all times material hereto was, a Delaware limited liability company with its principal place of business in Northbrook, Illinois. HVS is the parent company of HDS.

8. Sikich, LLC is, and all times material hereto was, a Delaware limited liability company with its principal place of business in Naperville, Illinois.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this matter because it raises a federal question under the DTSA, and the Court has supplemental jurisdiction over Hilco's state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391 because the majority of the material events giving rise to the claims asserted herein occurred in this District.

11. The Court has personal jurisdiction over Sikich. Sikich's principal place of business is in Naperville, Illinois, it has conducted and currently conducts business within the State of Illinois and the Northern District of Illinois, and the majority of the material events giving rise to this lawsuit occurred in Illinois.

12. Stevens was employed by Hilco at its Chicago, Illinois office pursuant to his *Employment, Confidentiality, Restrictive Covenants, and Inventions Agreement* (the "Stevens Agreement"), which contains an Illinois choice-of-law provision and a Cook County, Illinois choice-of-venue provision. (A true and authentic copy of the Stevens Agreement is attached hereto as **Exhibit A**.)

13. Baiocchi was employed by Hilco at its Chicago, Illinois office pursuant to his *Employment, Confidentiality, Restrictive Covenants, and Inventions Agreement* (the "Baiocchi Agreement"), which contains an Illinois choice-of-law provision and a Cook County, Illinois choice-of-venue provision. (A true and authentic copy of the Baiocchi Agreement is attached hereto as **Exhibit B**.)

## FACTUAL ALLEGATIONS

### *Hilco's Services*

14. HDS is an industry-leading provider of deal-specific financial and accounting diligence services for lenders across a diverse set of assignment types, including quality of earnings work and ABL field exams. ABL field exams are used by ABL lenders ("Lender-Customer") in connection with making and monitoring an ABL loan to a business and are required as part of the lender's policies. The focus of such diligence is on the assets and liabilities of the subject company ("Target-Borrower") and the suitability of the assets as collateral to support the loan.

15. HVS is an industry-leading provider of asset appraisals with a proven, decades-long track record of providing accurate appraisals across all asset categories. The scope of the valuations HVS delivers ranges from a single asset in one domestic location to millions of assets located around the world. Similarly, asset appraisals are used by ABL lenders in conjunction with

the ABL field exam to assess the value of certain of a Target-Borrower's assets as collateral for the loan.

16. Hilco optimizes efficiency and effectiveness for its customers throughout the deal life cycle. The diligence (field exam) teams and appraisal teams coordinate to ensure the quality and timeliness of deliverables while synchronizing asset analysis and scope of work. Hilco's streamlined execution of field exam solutions goes beyond most competitors' generic, standard "check box" exam by focusing on: (a) asset population consistency, to ensure appraisal and field exam data pools are in sync; and (b) potential lender red flags, perfection or ownership issues, ineligibles, or reserves, to ensure they are properly identified and navigated.

17. Hilco's field examination and diligence services include: (a) traditional ABL field exam transaction work, including accounts receivables and inventory borrowing base development and related field exam procedures; (b) complex ABL expertise – multiple operating companies, multiple lines of businesses, and cross border/multiple jurisdictions; (c) agented credits involving multiple bank and/or non-bank commercial lenders, "fallen angels" (i.e., investment-grade companies who have been downgraded to non-investment grade and are urgently seeking loan capital for operations), smaller lender groups involving two to four lenders a/k/a "club" deals, and single lender experience; and (d) specialty finance company exams for both commercial and consumer finance.

*Hilco's Confidential and Trade Secret Information*

18. Several years ago, HDS launched Hilco Engagement Aggregation Tools ("H.E.A.T.") to consolidate complex workstreams into streamlined "silos" that are directly integrated into final deliverable reports. This initiative improved operational efficiency, ensured accuracy, and enhanced the ability to customize deliverables to meet client-specific needs.

H.E.A.T. templates are designed as a unified system to organize unique HDS workstreams imported into final deliverables. Hilco accomplished this unified system and work product by leveraging direct interactions and insights from Lender-Customers and dealing with Target-Borrowers that operate in diverse industries. Hilco has spent years refining and revising the H.E.A.T. templates through investment of time and resources, and based on feedback from and interactions with Lender-Customers and Target-Borrowers, building upon the foundational efforts of the original initiative.

19. Hilco Level 1 Workbook: Hilco has spent, and continues to spend, substantial financial resources developing two types of H.E.A.T. Excel Workbooks. The first type is referred to as a Level One H.E.A.T. ("Hilco Level 1 Workbook"). The Hilco Level 1 Workbook constitutes a core deliverable and service offering provided by HDS, serving as the foundation for calculating the liquidity or availability generated from the liquidation of short-term assets as part of multi-million- or billion-dollar asset-based loans. This Hilco Level 1 Workbook is typically only assigned to experienced HDS team members due to the high level of scrutiny of the final outputs. The Hilco Level 1 Workbook features over 15 Excel "tabs" and extensive customized Excel formulas, supports the import and manipulation of unique and complex data sets, and includes prebuilt fields for customization to meet specific Lender-Customer needs. The Hilco Level 1 Workbook has been specifically designed to be integrated into Hilco deliverable reports via automation tools using proprietary software (described below) to incorporate important data and exhibits that underpin core HDS service offerings. Beyond numerical calculations, the workbook contains specific guidelines, instructions, and presentational elements created to meet the specific needs of HDS's Lender-Customers for companies operating in industries in which HDS performs its diligence services. These presentational and process elements give HDS, at scale, the ability to

provide polished and high-quality service to Lender-Customers and Target-Borrowers with efficiencies that reduce costs and give Hilco an advantage in this very competitive industry.

20. Hilco Level 2 Workbook: Hilco has developed a second H.E.A.T. Excel Workbook (the "Hilco Level 2 Workbook," and with the Level 1 Workbook, the "Hilco H.E.A.T. Workbooks"). The Hilco Level 2 Workbook contains over 20 Excel "tabs" and is designed to validate and contextualize datasets imported into the Hilco Level 1 Workbook. Its complex, embedded formulas help to identify key transactional details and criteria, providing insights into collateral performance over a 12–24-month period to aid Lender-Customer decision-making. Presentation and instructional elements have been refined through years of feedback from Lender-Customers and internal initiatives to which Hilco has dedicated substantial resources and employee work time. Consistent with the explanation for the Hilco Level 1 Workbook, this workbook is also specifically designed for integration into HDS deliverable reports via automation tools using proprietary software (discussed below), incorporating critical data and exhibits that support core HDS service offerings.

21. Field Exam Reports: Hilco has spent, and continues to spend, substantial financial resources developing its interactive Field Exam Reports (the "Field Exam Reports"), which document the results of its diligence work conducted through multiple workstreams. These workstreams are comprised of, among other things, management notes and the Hilco H.E.A.T. Workbooks, which contain (as described above) complex formulas to permit ease of filtering for certain attributes and/or perform certain financial calculations and are inter-connected to one another to ensure data consistency and minimize errors. The Field Exam Reports are organized by topic and structured with certain topics prioritized to permit ease of reading by Lender-Customers to ensure they obtain necessary information to assess risks and make critical decisions in their

lending process, including understanding the suitability and value of assets as collateral for a loan and whether or not any liabilities could limit the value of such assets. HDS has also acquired proprietary software to automatically synchronize Excel-based worksheets and financial data through, among other things, the Hilco H.E.A.T. Workbooks within the Field Exam Reports. This software provides multiple benefits including the automatic incorporation of changes made in the Hilco Heat Workbooks inputs into the Field Exam Reports, as well as a number of automatic visual aides to ensure professional presentation. The Field Exam Reports and the underlying Hilco H.E.A.T. Workbooks have been consistently updated and improved since their first implementation, and such updates/improvements typically involve hundreds of hours of professional time to perform successfully. The software implementation also required a significant financial investment by Hilco, as well as hundreds of hours to perfect. These efforts require an investment of time and resources and are performed on an ongoing basis as part of Hilco's continuous improvement philosophy.

22. Testing Tracker: Hilco has spent, and continues to spend, substantial financial resources developing its interactive Excel testing tracker (the "Testing Tracker"). The Testing Tracker standardized the request for testing and verification sample items, which formalizes the requested sample items and necessary follow-up questions with the Target-Borrower across all HDS field exams. It provides clear sections indicating HDS requests and Target-Borrower responses. Further, the Testing Tracker classifies tracking of request data based on date, urgency, and status. This combination increases efficiency and enhances communication with a Target-Borrower. This has been developed over time using experience gained by the HDS team throughout the years. As such, the Testing Tracker's inclusion and prioritization of requests reflects Hilco's judgment and analysis regarding, among other things, the key items to be reviewed

through the diligence process. If a competitor obtained and misappropriated the Testing Tracker, it could revise its own comparable product to match the Testing Tracker (i.e., a competitor may not ask a Target-Borrower about certain information, but upon review of the Testing Tracker, realizes that it could improve its own services and position in the marketplace if it did). Doing so without expending time, energy, or resources would put it at an unfair competitive advantage over Hilco.

23. Engagement Letters: Hilco has spent, and continues to spend, substantial financial resources developing its engagement letters ("Engagement Letters"), which are broken down into five topics: (1) introduction and definition of the parties; (2) a description of the engagement work; (3) fees, payment terms, high-level scope of work, and calendar/timing of deliverables; (4) legal terms and conditions; and (5) detailed scope of work. Hilco's performs its services for a variety of entities, not only Lender-Customers which include major banks, regional banks, and non-bank commercial lenders, but also a Borrower-Target, an operating company in the commercial or industrial space, or service businesses such as construction contractors, who may hire Hilco directly in connection with their search for a new lender. In some instances, a counterparty may be a third-party administrative agent, with no vested interest in the loan but who is acting on behalf of actual lenders to coordinate and execute various administrative loan matters for a fee. In the United States, this role is usually undertaken by an actual lender, but this third-party agent arrangement does occur in certain foreign loan transactions involving multiple bank investors in a single loan. The Target-Borrower is the company seeking to obtain a loan from the client bank or non-bank lender and is the subject of Hilco's diligence work. The Lender-Customer requires Hilco's work product before they can approve the loan and determine its limits and certain other conditions to the loan. Hilco's Engagement Letters include confidential and proprietary terms that

are customized depending on the services to be provided and the particular types of above-described parties involved. For example, depending on the type of engagement, the Engagement Letter includes legal protections regarding the specialized nature of the work and its intended purpose and audience, the associated fees, and the actual scope of work to be performed. Therefore, a variety of variables must be considered in the Engagement Letter, which Hilco has drafted and improved over more than 10 years to ensure, among other things, that Hilco does not suffer known risks in connection with the engagement.

24. In addition to the Hilco H.E.A.T. Workbooks, the Field Exam Reports, the Testing Tracker, and the Engagement Letters, Hilco's confidential and/or trade secret information also includes, without limitation, data included within Hilco's Excel workpapers and reports (including within the Hilco H.E.A.T. Workbooks and the Field Exam Reports); proprietary scope documents, such as Information Request Lists (IRL's); Excel AR roll forward H.E.A.T. Workbook files; Excel borrowing base certificates (BBCs), which are key summaries of Hilco's diligence efforts and contain complex internally developed formulas; field exam discussion topics which are specific diligence interview and inquiry workstream questionnaires drafted by Hilco to address to the employees and representatives of a Target-Borrower to efficiently and effectively obtain critical information ("Field Exam Discussion Topic Outlines"); and team calendars which identify HDS's customer list and assigned staffing resources for the full year 2024 (collectively, the "Confidential and Trade Secret Information"). If misappropriated, Hilco's Confidential and Trade Secret Information would enable a competitor to harm Hilco's business interests, and/or to use Hilco's Confidential and Trade Secret Information to gain an unfair competitive advantage over Hilco in competing for Hilco's existing and prospective business using, among other things, the various

interactive workbooks, templates, and reports that have taken Hilco years to develop through substantial work hours and financial investment.

*Hilco's Efforts to Protect Its Confidential and Trade Secret Information*

25. Hilco takes appropriate steps to guard its Confidential and Trade Secret Information, including, without limitation, its practices of requiring its employees, including Stevens and Baiocchi, to sign agreements that include provisions relating to non-disclosure/non-use/non-transfer of its Confidential and Trade Secret Information during employment and thereafter, requiring exiting employees to permit Hilco to take possession of, and access, an employee's personal devices and accounts on which any Hilco Confidential and Trade Secret Information is stored so that Hilco can ensure that all Hilco Confidential and Trade Secret Information is removed from such devices and accounts and has not been transferred to any other devices or accounts. In addition, Hilco routinely contracts with a forensic examination vendor to examine its exiting employees' Hilco-issued computers and use of Hilco's systems to ascertain whether there is evidence of the improper use, disclosure, or transfer of any Hilco Confidential and Trade Secret Information.

26. Hilco also limits access to its databases containing sensitive, competitively valuable business information to those with a legitimate business reason to access such information through the use of password protection; use of a firewall network security system and multi-factor authentication; provisions in its employee handbook directing employees to maintain confidentiality with respect to Hilco's documents and information; requiring annual employee training relating to codes of conduct and obligations of confidentiality; limiting access to its offices to employees to whom keycards have been issued with the capability to monitor each instance of keycard use; the use of an on-site document shredding machine for purposes of destroying

confidential information; termination of employee access to Hilco's computer systems and servers promptly upon separation of employment; and collecting Company property, including laptops, from separating employees.

*Stevens' Employment*
*with Hilco and Contractual Commitments*

27. In or around September 2020, HDS hired Stevens to work at its Chicago, Illinois office as an Associate Director. Stevens was ultimately promoted to Executive Director in or around September 2022. In this position, Stevens performed, among other things, diligence field exam services ("DFE Services") and led a team of analysts and other Hilco employees performing such services for Hilco.

28. On March 16, 2022, Stevens executed the Stevens Agreement in exchange for, among other things, continued employment and a signing bonus.

29. In the Stevens Agreement, Stevens promised, among other things, to maintain in confidence Hilco's Confidential and Trade Secret Information and not to use, access, copy, download, email, or reproduce any of Hilco's Confidential and Trade Secret Information other than for the proper performance of his duties for Hilco:

> (a) All Confidential Information shall be deemed property of HILCO and/or the Affiliates, and Employee shall use Employee's best efforts to protect the Confidential Information and other Company property for and on behalf of the Company. Employee shall not, directly or indirectly, use or disclose any Confidential Information except as may be required for the proper performance of Employee's duties for and on behalf of HILCO and/or the Affiliates, and in accordance with HILCO's and/or the Affiliates' policies and procedures relating thereto.
>
> (b) Employee shall not use, access, copy, download, email, reproduce, or otherwise duplicate, record, abstract, summarize, or re-create (including through memory) any Confidential Information, or use any Company computers, computer systems, equipment, tools, or other property of HILCO and/or the Affiliates, except as expressly permitted or required for the proper performance of Employee's duties for and on behalf of HILCO

> and/or the Affiliates. Employee is not authorized to, and shall not, use or access any Company computer or computer system, or use, access, copy, download, email, reproduce, or otherwise duplicate, record, abstract, summarize, or re-create (including through memory) any Confidential Information to (among other things) (i) compete or prepare to compete against HILCO and/or the Affiliates, or for or on behalf of any competitor, (ii) solicit or seek to provide services to any Customers (other than on behalf of HILCO and/or an Affiliate), or (iii) solicit or seek to induce any Business Partners to cease or reduce their business relationship with HILCO or such Affiliate (other than as required in the proper performance of Employee's duties and responsibilities for HILCO and the Affiliates).

(Stevens Agreement, §§6(a), (b).)

30. The Stevens Agreement defines Confidential Information (which encompasses its "trade secret information") as follows:

> "Confidential Information" means all confidential information of HILCO and/or the Affiliates, regardless of the form or medium in which it is or was created, stored, reflected, or preserved (including in Employee's memory), and includes trade secret information and all confidential information relating to or reflecting HILCO's and/or the Affiliates' research and development plans and activities; compilations of data; product plans; sales, marketing, and business plans and strategies; pricing, price lists, pricing methodologies, and profit margins; personnel; inventions, concepts, ideas, designs, and formulae; current, past, and prospective customer lists; current, past, and anticipated customer and prospective customer needs, preferences, and requirements; market studies; computer software and programs (including object code and source code); and computer and database technologies, systems, structures, and architectures. Employee understands that Confidential Information may or may not be labeled as "confidential."
> . . . .
> provided, however, that Employee's post-employment obligations not to use or disclose Confidential Information shall not apply if and to the extent Employee demonstrates that: (i) the same information was known to the public prior to its disclosure to Employee; (ii) the same information is or becomes generally available to the public and such public availability is not the result, directly or indirectly, of any fault of, or improper taking, use, re-creating (e.g., through memory), or disclosure by, Employee or anyone working in concert or participation with Employee; or (iii) Employee obtains the information properly, from a source that was free to disclose it, and under circumstances such that Employee neither knew nor had reason to know that such information had been acquired, used, or disclosed improperly.

(*Id.*, §5(c), §6(e).)

31. The Stevens Agreement also expressly provides: "Each of Employee's [confidentiality obligations] shall also apply to all confidential, trade secret, and proprietary information learned or acquired by Employee, as a result of Employee's employment with HILCO and/or the Affiliates, from or about others with whom HILCO and/or the Affiliates has, had, or contemplated having a business relationship." (Stevens Agreement, §6(c).)

32. Hilco expressly includes this language in its employment agreements because its valuation and DFE Services involve highly confidential information relating to, among other things, sensitive data, work product, and Hilco business and operations.

33. Stevens also promised to notify Hilco of any unauthorized disclosure or use of the Confidential and Trade Secret Information and to cooperate with Hilco to protect Hilco's rights in the same:

> Employee agrees to notify HILCO promptly of any intended or unintended, unauthorized disclosure or use of any Confidential Information by Employee or any other person or entity of which Employee becomes aware. Employee further agrees to assist and cooperate with HILCO in HILCO's efforts to protect HILCO's rights in and to the Confidential Information.

(*Id.*, §6(f).)

34. Stevens further agreed to certain non-competition and non-solicitation restrictions during his employment and for the one (1)-year period following his separation from his employment with HDS:

> Subject to the terms in Section 8 of this Agreement, Employee shall not, during the Restricted Period, directly or indirectly, on Employee's behalf or for or on behalf of any other person, firm, corporation, or entity:
>
> (a) provide any executive, managerial, supervisory, sales, marketing, research, product development, engineering, human resources, information technology, finance, consulting, business-planning, strategic, field examination, or customer-related services to assist any competitor in

> competing, directly or indirectly, against HILCO and/or the Affiliates in the Territory;
>
> . . . .
>
> (c) provide any competitive products or services to any Customers in the Territory;
>
> (d) solicit, divert, or take away, or attempt to solicit, divert, or take away from HILCO and/or the Affiliates the business of any of the Customers for the purpose of selling or providing to or servicing for any Customer any product or service which was provided by HILCO and/or the Affiliates during Employee's employment with HILCO and/or the Affiliates (or which product or service is a substitute therefor or competes therewith);

. . . .

(*Id.*, §7) (the "<u>Stevens Restrictive Covenants</u>").

35. In addition, the Stevens Agreement provides that the running of the above-referenced one (1)-year period shall be tolled during any period of time during which Stevens violated any of the Stevens Restrictive Covenants to which the one (1)-year period otherwise applied. (*Id.*, §5(f).)

36. The Stevens Agreement provides that HDS "affiliates," such as HVS, are third-party beneficiaries of the Stevens Agreement with "the full right and power to enforce and protect its rights and interests under this Agreement without limitation or other restriction." (*Id.*, §13.)

*Baiocchi's Employment*
*<u>with Hilco and Contractual Commitments</u>*

37. On March 29, 2021, HDS hired Baiocchi as an Associate in its Chicago office. In this position, HDS trained Baiocchi to, among other things, conduct due diligence field exams for asset-based loan facilities. Prior to HDS's hiring of Baiocchi, he had no experience performing DFE Services.

38. In September 2022, HDS promoted Baiocchi to the position of Senior Associate, in which position he performed higher-level DFE Services. In exchange for this promotion, continued employment, a base salary raise, and a $1,000 signing bonus, Baiocchi executed the Baiocchi Agreement.

39. The Baiocchi Agreement is identical in all material respects to the Stevens Agreement. It contains the same provisions regarding the use of Hilco's Confidential and Trade Secret Information. (*See* Ex. B., §§6(a), (b).)

40. The Baiocchi Agreement contains the same definition of Confidential Information (which encompasses its "trade secret information") as the Stevens Agreement. (*See id.*, §5(c), §6(e).)

41. Baiocchi also promised in the Baiocchi Agreement to return all Confidential and Trade Secret Information and Hilco-issued devices to Hilco upon separation from employment or at any other time at Hilco's request and not to delete or alter any Confidential and Trade Secret Information prior to doing so:

> Employee shall deliver promptly to HILCO or HILCO's designee, at the end of the Active Tenure or at any other time upon HILCO's request, all property of HILCO and any Affiliates, including, without limitation, (a) all Confidential Information (including all copies thereof, regardless of the medium in which such information may be stored), (b) all Company computers, smartphones, cell phones, pagers, tablets, and any other electronic communication and/or memory devices (the "Company Devices"), and (c) all other Company equipment, tools, keys, and key cards. Employee agrees not to alter, transfer, delete, or destroy (as applicable) any Confidential Information or Company Devices prior to delivering the same to HILCO.

(*Id.*, §6(d).)

42. In addition, Baiocchi promised in the Baiocchi Agreement to provide Hilco, upon request, with access to any of his personal devices or accounts on which any of Hilco's Confidential and Trade Secret Information may be stored:

> To the extent any Confidential Information is stored on any personal device or in any medium over which Employee has control, including, without limitation, in any personal cloud-based storage system or on any personal computer, personal data assistant, personal smartphones, personal cell phones, personal pagers, personal tablets, or any other personal electronic communication and/or memory devices, Employee agrees to permit HILCO and any Affiliate to take possession of and/or have access to (as applicable) such devices and Confidential Information at the end of the Active Tenure or at any other time upon HILCO's request for purposes of locating, extracting, and/or deleting such Confidential Information, and Employee shall provide HILCO and any Affiliate any passwords or other credentials needed for HILCO and any Affiliate to locate, extract, and/or delete such Confidential Information. For the avoidance of doubt, nothing herein alters any Company policy regarding the appropriate devices, databases, and cloud storage services on which Confidential Information may be accessed and stored.

(*Id.*)

43. Baiocchi further promised in the Baiocchi Agreement to notify Hilco of any unauthorized disclosure or use of the Confidential and Trade Secret Information and to cooperate with Hilco to protect Hilco's rights in the same:

> Employee agrees to notify HILCO promptly of any intended or unintended, unauthorized disclosure or use of any Confidential Information by Employee or any other person or entity of which Employee becomes aware. Employee further agrees to assist and cooperate with HILCO in HILCO's efforts to protect HILCO's rights in and to the Confidential Information.

(*Id.*, §6(f).) Hereinafter, Section 5(e) and Section 6 of both the Stevens Agreement and the Baiocchi Agreement will be referred to collectively as the "Confidential Information Protections."

44. Baiocchi further agreed to certain non-competition and non-solicitation restrictions during his employment and for the one (1)-year period following his separation from his employment with HDS:

> Subject to the terms in Section 8 of this Agreement, Employee shall not, during the Restricted Period, directly or indirectly, on Employee's behalf or for or on behalf of any other person, firm, corporation, or entity:
>
> (a) provide any executive, managerial, supervisory, sales, marketing, research, product development, engineering, human resources, information technology, finance, consulting, business-planning, strategic, field examination, or customer-related services to assist any competitor in competing, directly or indirectly, against HILCO and/or the Affiliates in the Territory;
>
> . . . .
>
> (c) provide any competitive products or services to any Customers in the Territory;
>
> (d) solicit, divert, or take away, or attempt to solicit, divert, or take away from HILCO and/or the Affiliates the business of any of the Customers for the purpose of selling or providing to or servicing for any Customer any product or service which was provided by HILCO and/or the Affiliates during Employee's employment with HILCO and/or the Affiliates (or which product or service is a substitute therefor or competes therewith);

. . . .

(*Id.*, §7, the "Baiocchi Restrictive Covenants".)

45. In addition, the Baiocchi Agreement provides that the running of the above-referenced one (1)-year period shall be tolled during any period of time during which Stevens violated any of the Baiocchi Restrictive Covenants to which the one (1)-year period otherwise applied. (*Id.*, §5(f).)

46. The Baiocchi Agreement provides that HDS "affiliates," such as HVS, are third-party beneficiaries of the Baiocchi Agreement with "the full right and power to enforce and protect its rights and interests under this Agreement without limitation or other restriction." (*Id.*, §13.)

*Sikich Tortiously Interferes with the Stevens Agreement*

47. In or around June 2023, Stevens separated from his employment with Hilco. At that time, Stevens was an Executive Director at Hilco performing DFE Services.

48. In or around July 2023, Stevens began his employment with Sikich as its Director of Transaction Advisory Lending Services. In his role as Director, Stevens performed job duties nearly identical to those he performed as an Executive Director at Hilco.

49. Specifically, Stevens was responsible for, among other things, leading a team that performed Sikich's ABL diligence services to evaluate Target-Borrower collateral, assess risk to ensure Lender-Customer investments are successful, and perform DFE services, including field exams.

50. In accepting the role, Stevens breached the Stevens Restrictive Covenants because the services he would be providing for Sikich were directly competitive with the services he provided for HDS. (*See* Ex. A, §7(a).)

51. Upon information and belief, senior Sikich leaders, including Stevens' direct supervisor John Iwanski, Principal – Transaction Advisory Services ("Iwanski"), were aware of Stevens' Agreement and the contractual obligations he owed to HDS at the time they extended an offer of employment to him.

52. In recruiting, extending an offer of employment to, and/or hiring Stevens, Sikich deliberately and tortiously interfered with Hilco's contractual relationship with Stevens and induced him to breach the Stevens Restrictive Covenants.

*Stevens and Iwanski Recruit Baiocchi to Resign His HDS Employment and Join Sikich*

53. On August 4, unbeknownst to Hilco at the time, Stevens, Baiocchi's former Hilco Manager, sent an email from his Sikich e-mail account to Baiocchi with the title "Mark / John / Michael cigars and meet." As of that date, Baiocchi was an Associate Director for HDS, having been promoted to that position in January 2024.

54. Unbeknownst to Hilco at the time, Iwanski and Stevens met with Baiocchi on August 6 (the "August 6 Meeting"). The following day, Stevens sent Baiocchi an email from Stevens' Sikich e-mail account inviting Baiocchi to complete a job application through LinkedIn for a position reporting to Stevens with the title, "Manager – Transactional Advisory Lender Services" (the "Sikich Position"). Stevens stated in the email, "That will get the remainder of the admin stuff started on our end so we can get the process started," which suggests that Stevens and/or Iwanski had extended, and Baiocchi had agreed to accept, employment in the Sikich Position.

55. The Sikich Position has essentially the same job duties as the HDS Associate Director position held by Baiocchi at the time (the "Hilco Position"). Specifically, Sikich's LinkedIn job posting for the Sikich Position included the following responsibilities, which are essentially the same responsibilities Baiocchi was performing for HDS:

- Mentor and lead [Lender Services] ("LS") Team
- Manage LS team responsibilities and work with Directors and Partners on a regular basis
- Assist and maintain an updated budget and fee analysis
- Ability to service multiple chargeable client engagements simultaneously
- Review and continuously evaluate reports and projects from LS Team related to clients
- Lead the collateral analysis for field exams
- Consult financial statement information (income statements, balance sheets, and other reports) and provide thoughtful business observations and conclusions
- Consult and support LS team members in the development of high-level reports and client presentations to support business strategy and need
- Propose solutions to lender risks and problem solution tactics
- Participate in the active recruitment and training of new LS team members, specifically Associates
- Active participation in team meetings, calls, client relations and serve as secondary point of contact for clients when needed
- Actively engages and seeks new business opportunities for aspects of LS and the firm

(LinkedIn Post Accessed 11/7/24.)

56. On September 18, Baiocchi sent a copy of the Baiocchi Agreement to Stevens' Sikich work email address, and Stevens, in turn, forwarded a copy of the Baiocchi Agreement to Iwanski.

57. On September 18, and the same day that Baiocchi sent a copy of the Baiocchi Agreement to Stevens, unbeknownst to Hilco, Baiocchi signed his letter agreement with Sikich (the "Sikich Agreement"), for the above-described Sikich Position, reporting to Stevens, with a start date of October 7.

58. In recruiting, extending an offer of employment to, and/or hiring Baiocchi, Sikich deliberately and tortiously interfered with Hilco's contractual relationship with Baiocchi and induced him to breach the Baiocchi Restrictive Covenants.

59. In encouraging and/or permitting Stevens to be involved in the recruitment of, extension of a job offer to, and hiring of Baiocchi, Sikich also deliberately and tortiously interfered with Hilco's contractual relationship with Stevens, whose employee non-solicitation restriction remained in full force and effect under Section 4(f) the Stevens Agreement by virtue of his clear and ongoing breach of his non-competition restriction.

60. On or about September 24, Baiocchi provided notice to HDS of his intention to resign his employment, effective October 4.

61. During the final days of his employment with Hilco, when questioned, Baiocchi assured Hilco management that he had not transferred, and would not transfer, any Hilco information. When asked where Baiocchi was going to work, Baiocchi refused to identify his new employer, but assured Hilco management that his new job would not involve the performance of DFE Services. Hilco would come to learn that all of these statements were false.

*Sikich's Egregious Theft of Hilco's Confidential Information*

62. On September 17, unbeknownst to Hilco at the time, Sikich received a spreadsheet of Hilco contacts with whom Baiocchi had worked at Hilco (the "Stolen Contact List"), which constitutes Hilco's Confidential and Trade Secret Information. This Stolen Contact List was received by Sikich by way of Baiocchi's email directly to Stevens, a Sikich Director, at Stevens' Sikich work e-mail address.

63. On October 3, on Baiocchi's penultimate day of employment with HDS, Sikich received via Baiocchi text message to Sikich Director Stevens seven (7) iPhone photographs of a Hilco spreadsheet listing every project Hilco had worked on in 2024 (the "Project List Screen Shots"). Sikich received the Project List Screen Shots in the form of photographs taken by Baiocchi of his Hilco-provided laptop screen of a spreadsheet that included highly confidential and competitively valuable details about Hilco's 2024 projects.

64. Sikich and Stevens were aware that Baiocchi was attempting to conceal these improper transfers to Sikich and Stevens. In fact, Baiocchi acknowledged that sending this information to Stevens was improper, stating: "I wasn't going to email this 😂."

65. Baiocchi also said to Stevens: "Yeah, gives a good range of what to charge each client," indicating that Sikich could use this stolen confidential information to compete against HDS (i.e., use this information to structure Sikich's pricing when competing against HDS).

66. Stevens then replied by text to Baiocchi: "Me, you, and Tony will chat at the retreat. A couple of these places are still waiting on adding vendors but planning on reaching out again when you're onboarded as I think it shows that we're continuing to invest/grow the business. We'll get there."

67. Upon information and belief, the "Tony" referenced in the text message is another Sikich executives, Anthony Martorano, Sikich's Director of Business Development.

68. Upon information and belief, Sikich planned to further its egregious tortious conduct against Hilco at an upcoming Sikich retreat. Specifically, Stevens planned to convene a meeting with Baiocchi and Martorano at Sikich's retreat to go through the Hilco's contact lists in order to develop a business plan for pursuing Hilco's contacts, thereby further tortiously interfering with Hilco's contract by inducing Baiocchi to breach his client non-solicitation restriction.

69. No doubt encouraged by his positive interactions with Stevens concerning, among other things, the Hilco Stolen Contact List and Project List Screen Shots, Baiocchi continued to transfer Hilco's Confidential and Trade Secret Information to Sikich while acting as a management-level agent of Sikich. Specifically, Baiocchi sent from his personal Gmail account to Stevens' Sikich work email address thirteen (13) H.E.A.T. Workbooks (the "Stolen Workbooks") and a template Field Exam Report ("Presentation1.ppxt").

70. The next day, on October 15, Sikich received additional Hilco Confidential and Trade Secret Information from Baiocchi. Specifically, Baiocchi sent Hilco documents from his Gmail account to the Sikich work email address of another Sikich manager (and former Hilco employee), Livingston. Those emails attached: (a) the same Stolen Workbooks Baiocchi had forwarded to Stevens, (b) the Presentation1.ppxt Field Exam Report, (c) a completed Testing Tracker (the "Stolen Testing Tracker"), and (d) several Engagement Letters (the "Stolen Engagement Letters").

71. That same day, on October 15, Sikich received from Baiocchi several template Field Exam Discussion Topic Outlines (the "Stolen Field Exam Outlines") and a Stolen Workbook

via Baiocchi sending an e-mail with these stolen files attached from his personal Gmail account to Stevens' and Livingston's Sikich work email addresses.

72. In addition to the stolen files and documents described above, Baiocchi e-mailed other Hilco documents and files to his personal Gmail account during the time period when Sikich was (a) improperly soliciting him to breach the Baiocchi Agreement by accepting employment with Sikich, and (b) improperly inducing Stevens to breach his employee non-solicitation by directly involving him in the recruitment and hiring of Baiocchi.

73. For instance, on August 3, just three days prior to the August 6 Meeting, and unbeknownst to Hilco at the time, Baiocchi emailed from his Hilco email account to his personal Gmail account three (3) Field Exam Reports totaling almost 300 pages prepared by Hilco (the "Stolen Field Exam Reports"), which also constitute Hilco's Confidential and Trade Secret Information for the reasons described above, and which include highly confidential and proprietary information.

74. Moreover, on September 17, unbeknownst to Hilco at the time, Baiocchi emailed from his Hilco email account to his personal Gmail account a template spreadsheet containing critical questions to be asked of the Target-Borrower during a field exam (the "Stolen IRL"), which constitutes Hilco's Confidential and Trade Secret Information for the reasons described above.

75. On September 27, shortly after accepting his offer of employment with Sikich, Baiocchi emailed himself a completed Cash Management Overview Workbook (the "Stolen Cash Management Overview"), which constitutes Hilco's Confidential and Trade Secret Information for the reasons described above, and which also includes highly confidential information concerning its Business Partner.

76. For purposes of this Complaint, the Stolen Workbooks, the Stolen Field Exam Reports, the Stolen Engagement Letters, the Stolen Testing Tracker, the Stolen Field Exam Outlines, the Stolen IRL, the Stolen Contact List, the Stolen Cash Management Overview, the Project List Screenshots, and the files that Baiocchi e-mailed to Sikich at Stevens' and Livingston's Sikich e-mail addresses (some of which are the aforementioned confidential documents [e.g., the Stolen Workbooks]) will be referred to collectively as the "Known Stolen Information."

77. Sikich used at least some of the Known Stolen Information. For example, following his transfer of most of the Known Stolen Information to Stevens and Livingston, with whom he had nothing but positive interactions concerning such transfers, Baiocchi created variants of the Known Stolen Information and used the same with his team to provide Sikich with an unfair competitive advantage in the marketplace.

78. Some or all of the Known Stolen Information was housed and stored on Sikich's equipment and systems, including in Sikich's One-Drive database as well as on Baiocchi's Sikich-provided laptop.

79. Sikich further used, received, housed and stored the above-described Known Stolen Information on its email systems via, at a minimum, Stevens' and Livingston's Sikich email addresses.

*Hilco Learns of Baiocchi's Misappropriate of Trade Secrets, Demands Sikich Take Action*

80. Baiocchi engaged in efforts to conceal his misconduct. On October 3, the day before his final day of employment with Hilco, Baiocchi "hard deleted" over 3,000 emails from his Hilco MS Outlook account, meaning he deleted those emails and then deleted those items from his "Deleted Items" folder in MS Outlook.

81. To further obfuscate the breaches of his contractual obligations to Hilco, Baiocchi's updated LinkedIn profile did not identify Sikich (or any other employer) following his resignation, despite listing Hilco as his former employer, and listing his new job title without the name of his new employer.

82. Hilco was ultimately able to restore some or all of Baiocchi's deleted Hilco emails. When that account was reviewed, Hilco discovered the August 3 and September 17 emails Baiocchi had sent to his personal Gmail account with the Stolen Field Exam Reports, the Stolen Engagement Letters, and the Stolen Testing Tracker.

83. Accordingly, on November 8, the undersigned outside counsel for Hilco, William J. Wortel ("Wortel"), sent a letter to Baiocchi's Gmail address which attached a copy of the Baiocchi Agreement, quoted Baiocchi's contractual obligations under the terms of his Baiocchi Agreement, explained the various breaches of the same, and demanded that Baiocchi cease and desist from violating the terms of the Baiocchi Agreement.

84. Baiocchi responded to the transmittal email the same day (November 8), with the following message: "What is this regarding? Cease and desist?" Wortel responded, "Have you read the letter that was attached to my email?" In response, Baiocchi quipped, "I'm not going to read all that. Please summarize it."

85. Wortel responded the next morning to Baiocchi: "Whether you choose to read the letter is up to you, but note that it requires you to take certain actions by COB Monday or face legal action." The same day, Baiocchi challenged the enforceability of the Baiocchi Agreement, in response to which Wortel advised Baiocchi as follows: "I strongly recommend that you consult legal counsel as soon as possible."

86. The following day (November 10), Baiocchi sent Wortel an email stating as follows: "My firms [sic] internal counsel is going to handle everything from here on out."

87. Unbeknownst to Hilco at the time, Baiocchi and Stevens were texting each other, mocking Hilco's efforts to prevent the misappropriation of its Confidential and Trade Secret Information and ensure that Baiocchi complied with his contractual obligations. A relevant screenshot of those text messages is below.

**Michael Baiocchi <6308648771>** ◄ 11/8/2024, 11:33
Lol keep this between us but I just got a cease and desist from Hilco emailed to me from some lawyers

Receipts • Mark Stevens <9134866546> [D:11/8/2024, 11:33 PM]

**Michael Baiocchi <6308648771>** ◄ 11/8/2024, 11:34
Third party lawyers on behalf of Hilco

Receipts • Mark Stevens <9134866546> [D:11/8/2024, 11:34 PM]

**Mark Stevens <9134866546>** ► 11/8/2024, 11:35
Seriously?

Receipts • Michael Baiocchi <6308648771> [R:11/8/2024, 11:35 PM]

**Mark Stevens <9134866546>** ► 11/8/2024, 11:35
What does it say?

Receipts • Michael Baiocchi <6308648771> [R:11/8/2024, 11:35 PM]

**Mark Stevens <9134866546>** ► 11/8/2024, 11:35
What a loser lol

*Sikich's Refusal to Cooperate with Hilco*

88. Although Sikich initially indicated it would cooperate with Hilco, Sikich has stonewalled Hilco over the past two months, refusing to provide information that would permit Hilco to ascertain the scope of Sikich's use and disclosure, and the current location(s) of, Hilco's confidential and trade secret information, including but not limited to the Known Stolen Information, and variants thereof.

89. Notwithstanding Sikich's knowledge of the above-described transfers Known Stolen Information to its management, equipment, and systems, Sikich encouraged, induced, and/or permitted Baiocchi and other Sikich employees to receive, access, and/or use Hilco's Confidential and Trade Secret Information to provide Sikich with an unfair competitive advantage in the workplace to the detriment of Hilco's competitive position.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS UNDER
## THE DEFEND TRADE SECRETS ACT UNDER 18 U.S.C. § 1836, *et seq.*

90. Hilco re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

91. Hilco is the owner of the above-described valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce, including, without limitation, the highly confidential and competitively valuable information described above.

92. Hilco took, and has taken, the above-described reasonable measures to keep such information secret.

93. Hilco did not give Sikich or those acting on Sikich's behalf, including but not limited to Baiocchi, Stevens, and/or Livingston, express or implied permission to discuss, receive, divulge, or use any of Hilco's Confidential Information and Trade Secrets.

94. The above-described actions of Sikich's management-level employees constitutes misappropriation of Hilco's trade secret information.

95. Sikich's misappropriation of Hilco's trade secrets was negligent, knowing, willful, and/or malicious. Sikich knew and should have known of the aforementioned conduct of its agents and employees. For example, Stevens was aware that the Stolen Contact List, the Project List Screen Shots, and the other Hilco files Sikich received via Baiocchi's emails to Stevens and

Livingston constituted Hilco's trade secret information and that Baiocchi, Stevens, and Livingston, as well as other employees and/or agents of Sikich, intended to use the same on behalf of Sikich to provide Sikich with an unfair competitive advantage over Hilco.

96. Sikich knew or had reason to know at the times of such disclosure and use that the knowledge of Hilco's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

97. As a result of Sikich's misappropriation of Hilco's trade secrets, Hilco has suffered harm in the form of, *inter alia*, actual misappropriation of Hilco's trade secrets, injury and harm to its goodwill, business reputation, and competitive position, and the loss and expenditure of significant legal and other fees and expenses to conduct its investigation and remediate harm to the extent possible, including but not limited to pre-litigation attorneys' fees and forensic examination expenses incurred by Hilco.

98. Hilco is entitled to an award of all actual direct and consequential damages sustained as a result of Sikich's misappropriation, exemplary damages, an award of Hilco's reasonable attorneys' fees, and a permanent injunction, together with any other relief deemed equitable or appropriate by the court.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS UNDER 765 ILCS 1065/1, *et seq*.**

99. Hilco re-alleges and incorporates by reference the allegations of the preceding paragraphs as though fully set forth herein.

100. Hilco owns valuable trade secrets that were disclosed to Baiocchi in the course of his employment with Hilco.

101. Such information constitutes trade secrets pursuant to the provisions of the ITSA.

102. Sikich knew or had reason to know that such trade secrets are confidential and proprietary to Hilco. However, despite such knowledge, Sikich improperly acquired and used for its own purposes such trade secrets without Hilco's express or implied consent.

103. Sikich's misappropriation of Hilco's trade secrets was negligent, knowing, willful, and/or malicious. Sikich knew and should have known of the aforementioned conduct of its agents and employees. For example, Stevens was aware that the Stolen Contact List, the Project List Screen Shots, and the other Hilco files Sikich received via Baiocchi's emails to Stevens and Livingston constituted Hilco's trade secret information and that Baiocchi, Stevens, and Livingston, as well as other employees and/or agents of Sikich, intended to use the same on behalf of Sikich to provide Sikich with an unfair competitive advantage over Hilco.

104. Sikich knew or had reason to know at the times of such disclosure and use that the knowledge of Hilco's trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

105. As a result of Sikich's misappropriation of Hilco's trade secrets, Hilco has suffered harm in the form of, *inter alia*, actual misappropriation of Hilco's trade secrets, injury and harm to its goodwill, business reputation, and competitive position, and the loss and expenditure of significant legal and other fees and expenses to conduct its investigation and remediate harm to the extent possible, including but not limited to pre-litigation attorneys' fees and forensic examination expenses incurred by Hilco.

106. Hilco is entitled to an award of all actual direct and consequential damages sustained as a result of Sikich's misappropriation, exemplary damages, an award of Hilco's reasonable attorneys' fees, and a permanent injunction, together with any other relief deemed equitable or appropriate by the court.

**COUNT III**
**TORTIOUS INTERFERENCE WITH CONTRACT (BAIOCCHI AGREEMENT)**

107. Hilco re-alleges and incorporates the preceding paragraphs as if set forth fully herein.

108. Baiocchi was party to a valid contract with Hilco, which included, among other things, the Baiocchi Restrictive Covenants.

109. Sikich was aware of Baiocchi's continuing contractual obligations to Hilco under the Baiocchi Agreement.

110. In spite of the above, Sikich intentionally interfered with Hilco's contractual relations with Baiocchi, including, without limitation, through its management-level employees, Stevens and Iwanski, intentionally inducing Baiocchi to breach, *inter alia*, the Baiocchi Restrictive Covenants for an improper purpose and by improper methods.

111. Sikich's misconduct in this regard was wanton, willful, intentional, and in reckless disregard of Hilco's rights.

112. Hilco has been damaged as a result of Sikich's tortious interference with its contractual relations with Baiocchi in an amount to be determined at trial for, *inter alia*, the loss and expenditure of significant legal and other fees and expenses to conduct its investigation and remediate harm to the extent possible, including but not limited to the attorneys' fees and costs incurred by Hilco in bringing related litigation against Baiocchi.

113. Hilco is entitled to an award of all actual direct and consequential damages sustained as a result of Sikich's tortious interference with its contractual relations with Baiocchi, and punitive damages for Sikich's willful and malicious conduct, together with any other relief deemed equitable or appropriate by the court.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH CONTRACT (STEVENS AGREEMENT)**

114. Stevens was party to a valid contract with Hilco, which included, among other things, the Stevens Restrictive Covenants.

115. Sikich was aware of Stevens's continuing contractual obligations to Hilco under the Stevens Agreement.

116. In spite of the above, Sikich intentionally interfered with Hilco's contractual relations with Stevens, including, without limitation, through its management-level employees, including Iwanski, intentionally inducing Stevens to breach, *inter alia*, the Stevens Restrictive Covenants for an improper purpose and by improper methods.

117. Sikich's misconduct in this regard was wanton, willful, intentional, and in reckless disregard of Hilco's rights.

118. Hilco has been damaged as a result of Sikich's tortious interference with its contractual relations with Stevens in an amount to be determined at trial for, *inter alia*, the loss and expenditure of significant legal and other fees and expenses to conduct its investigation and remediate harm to the extent possible, including but not limited to the attorneys' fees and costs incurred by Hilco in bringing related litigation against Baiocchi.

119. Hilco is entitled to an award of all actual direct and consequential damages sustained as a result of Sikich's tortious interference with its contractual relations with Stevens, and punitive damages for Sikich's willful and malicious conduct, together with any other relief deemed equitable or appropriate by the court.

## PRAYER FOR RELIEF

WHEREFORE, Hilco respectfully prays that the Court enter judgment in its favor and against Baiocchi on Hilco's Complaint, as follows:

(a) An Order granting permanent injunctive relief enjoining and restraining Sikich from utilizing, divulging, disclosing, or misusing any of the Known Stolen Information or other Confidential Information (as defined in the Baiocchi Agreement), and any variant identified over the course of discovery.

(b) An Order that Sikich certify to the Court that it has destroyed all documents and things that include or embody Hilco's trade secrets and other intellectual property, including but not limited to the Known Stolen Information or other Confidential Information (as defined in the Baiocchi Agreement).

(c) A judgment against Sikich on Hilco's claim under to the DTSA, including, but not limited to, all actual direct and consequential damages sustained as a result of Sikich's misappropriation, a reasonable royalty for Sikich's use of the same, exemplary damages, and an award of Hilco's reasonable attorneys' fees and expenses.

(d) A judgment against Sikich on Hilco's claim under to the ITSA, including, but not limited, to, all actual direct and consequential damages sustained as a result of Sikich's misappropriation, a reasonable royalty, exemplary damages, an award of Hilco's reasonable attorneys' fees and expenses, and the forensic vendor fees it incurs relating to this dispute.

(e) A judgment that Sikich tortiously interfered with Hilco's contractual relations with Baiocchi and Stevens in an amount to be proven at trial, including, but not limited to, restitution, compensatory, actual, consequential, and punitive and/or exemplary damages, the attorneys' fees

and costs Hilco expends in the litigation it filed against Baiocchi, and the forensic vendor fees it incurs relating to this dispute.

(f) Expenses and costs incurred by Hilco in bringing this action.

(g) Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff Hilco demands a trial by jury on all issues in this action.

Dated: January 29, 2025

Respectfully submitted,

/s/ William J. Wortel
One of the Attorneys for Plaintiffs

William J. Wortel
Patrick DePoy
Steven Trubac
BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street
Suite 4300
Chicago, Illinois 60601
(312) 602-5000
(312) 602-5050 (facsimile)
bill.wortel@bclplaw.com
patrick.depoy@bclplaw.com
steve.trubac@bclplaw.com